**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| **CHARLINDA WELLS,** | § | |
| *Plaintiff* | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 9:21-cv-63** |
| | § | |
| **CITY OF CORRIGAN, TEXAS,** | § | |
| **L. W. YANKIE, DARRIAN HUDMAN,** | § | |
| **DARRELL GIBSON, & BERT SIMMS,** | § | |
| | § | |
| *Defendants* | § | **JURY DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff, CHARLINDA WELLS, ("Wells," "Ms. Wells," and/or "Plaintiff") files this Original Complaint and would respectfully show the Court as follows:

## INTRODUCTION

1.     Plaintiff Charlinda Wells ("Plaintiff," "Ms. Wells," and/or "Wells") brings this action as authorized by 42 USC § 1983 ("§ 1983") against Defendants:  her former employer, the City of Corrigan, Texas ("City" or "City of Corrigan"); and the individual Defendants; Corrigan Municipal Judge L. W. Yankie ("Municipal Judge," "Judge" and/or "Yankie"); Corrigan City Manager Darrian Hudman ("City Manager," Mr. Hudman" and/or "Hudman"); Corrigan City Police Chief Darrell Gibson ("Police Chief," "Mr. Gibson" and/or "Gibson"); and former Corrigan Police Officer Bert Simms ( "CPD Officer Simms" or "Simms"), for illegal sexual harassment and/or retaliation in violation of her constitutional rights to equal protection of the laws and free speech.  Plaintiff also brings pendant state law claims against the Defendant City of Corrigan under the *Texas Labor Code* § 21.001, *et seq.*, for sex discrimination, sexual harassment, and retaliation.

2.      Plaintiff Wells was employed in an administrative capacity in Defendant City of Corrigan's Municipal Court where she was subject to frequent sexually offensive and/or retaliatory hostile conduct by various City officials—some of whom are named Defendants—including her supervisors Defendants Municipal Judge Yankie and City Manager Hudman.  Consistent with the City's sexual harassment policy, Wells repeatedly reported the harassment and retaliation to various City officials, including Judge Yankie and City Manager Hudman.  No meaningful corrective action was ever taken.  Even after Judge Yankie admitted he was "conditioning" Ms. Wells to have sex with him, the City and the other Defendants did nothing to end the harassment or retaliation against Ms. Wells.  Because of the resulting stress, Ms. Wells sought counselling and reasonably felt compelled to resign for the sake of her mental health on the advice of her counselor.

3.      Plaintiff Wells seeks Court-enforceable equitable relief, including lost pay, reinstatement if appropriate and with reasonable safeguards against future discrimination and/or retaliation, compensatory and punitive damages, and litigation costs including attorney fees, as allowed by law.

## PARTIES

**A.      Plaintiff:**

4.      Plaintiff, Charlinda Wells, is woman and a citizen and resident of the state of Texas and the United States, and was employed by Defendant City of Corrigan, Texas in the Eastern District of Texas from April 2017 until April 5, 2019, when the City compelled her to resign by the Defendants' conduct complained of in this case.

5.      Plaintiff Wells is, and was at all times pertinent to this case, entitled to the rights and protections of the federal Constitution and laws, including the rights to free speech and equal

protection of the laws found in the First and Fourteenth Amendment to the Constitution, respectively.

6.     Plaintiff Wells was at times pertinent to this case an employee, as that term is defined in Texas Labor Code, entitled to the Texas Labor Code's protections against sex discrimination and retaliation in employment.

**B.     Defendants:**

7.     **Defendant City of Corrigan** is a municipality operating under color of the laws of the State of Texas and is a "person" subject to suit under § 1983 for violations of federal rights pursuant to official policy, or a custom or usage that constitutes the force of law, or ratification by a policy maker.

8.     Defendant City of Corrigan is an employer, respondent, and political subdivision of the State of Texas, as those terms are defined in *Texas Labor Code* § 21.002.

9.     Defendant City of Corrigan is prohibited from discriminating employees on the basis of sex, including sexual harassment, and/or from retaliating against employees for opposing illegal discrimination, including sexual harassment, by *Texas Labor Code* § 21.051 and .055.

10.     Defendant City of Corrigan is also prohibited from, and liable for, violating any citizen's, including Plaintiff Wells', rights to free speech protected by the First Amendment to the United States Constitution.

11.     Defendant City of Corrigan is also prohibited from, and liable for, violating any citizen's, including Plaintiff Wells', rights to equal protection of the laws protected by the Fourteenth Amendment to the United States Constitution.

12.     Defendant City of Corrigan can be served through its mayor, currently Mayor Johnna Gibson, at its principal place of business, City of Corrigan, 101 W. Ben Franklin, Corrigan, TX 75939.

13.     **Defendant L. W. Yankie** is a governmental official—Defendant City of Corrigan's Municipal Judge—sued in his individual and official capacities for abusing his position to sexually harass and retaliate against Plaintiff Wells while acting under color of state law, in violation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution. Defendant Judge Yankie was Plaintiff Wells' immediate or next-higher level supervisor at times pertinent hereto, and a city policy maker for matters related to the Municipal Court.  Defendant L. W. Yankie can be served at his place of business, the City of Corrigan Municipal Court, 1001 North Home Street, Corrigan, TX 75939.

14.     **Defendant Darrian Hudman** is a government official—Defendant City of Corrigan's City Manager—sued in his individual and official capacities for abusing his position to sexually harass and retaliate against Plaintiff Wells, and permit others to do so, while acting under color of state law in violation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Defendant Hudman was a member of City management above Ms. Wells and, under the circumstances of this case, including the City Policy Manual addressed below, he was a City policy maker.  Defendant Darrian Hudman can be served at his place of business, the City of Corrigan, 101 W. Ben Franklin St., Corrigan, TX 75939-2040.

15.     **Defendant Darrell Gibson** is a government official—Defendant City of Corrigan's Police Chief—sued in his individual and official capacities for abusing his position to sexually harass and retaliate against Plaintiff Wells while acting under color of state law in violation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Defendant

4

Gibson can be served at his place of business, the City of Corrigan, 101 W. Ben Franklin St., Corrigan, TX 75939-2040.

16.      **Defendant Bert Simms** is, or was at times pertinent to this case, a government official, a police officer in Defendant City of Corrigan's Police Department, sued in his individual and official capacities for abusing his position to sexually harass and retaliate against Plaintiff Wells while acting under color of state law in violation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Defendant Simms can be served at his last known place of business, the City of Corrigan, 101 W. Ben Franklin St., Corrigan, TX 75939-2040.

## JURISDICTION AND VENUE

17.      Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has original federal question jurisdiction because this action includes claims arising under 42 USC §1983.

18.      The Court has supplemental/pendant jurisdiction pursuant to 28 U.S.C. § 1367 over this action's claims under the *Texas Labor Code*.

19.      Venue is proper in the U.S. District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b)(2).

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

20.      On or about September 26, 2019, Plaintiff Wells timely filed a charge of discrimination with the EEOC and Texas Commission on Human Rights, satisfying administrative prerequisites for her claims pursuant to the *Texas Labor Code*.  Plaintiff Wells has requested, but not yet received, a right-to-sue letter from the EEOC authorizing her to pursue claims pursuant to 42 U.S.C. § 2000e, et seq., ("Title VII").  Wells anticipates amending this, her Original Complaint, to include her Title VII claims after receipt of a right-to-sue letter from the EEOC.

## CONDITIONS PRECEDENT

21.    All conditions precedent to the claims presented in this Original Complaint have been performed or have occurred.

## FACTS

**A.    Plaintiff Wells' employment and performance:**

22.    Defendants City of Corrigan and its Municipal Judge Yankie hired Plaintiff Wells in early April 2017 to initially to work as a municipal court clerk, reporting to a more senior clerk, Tammy Ezernack.   In December 2017, the City of Corrigan then promoted Ms. Wells to be Municipal Court Administrator, reporting directly to Judge Yankie.   Ms. Wells' performance was excellent and she was never subject to legitimate criticism or disciplinary action.

**B.    The City's pertinent Personnel Policy and Procedure Manual:**

23.    Defendant City of Corrigan adopted a Personnel Policy and Procedure Manual, dated October 1, 2014, ("City Policy Manual").   This is the only statement of the City's personnel policies considered to be current during the time Plaintiff Wells was employed by the City. Although the Policy Manual at sometimes refers to its contents as "guidelines," it provides that employees "shall follow the guidelines within this policy for the reporting of …discrimination in the workplace…."

24.    The City Policy Manual provides that, other than matters reserved for the City Council, the City Manager is the final authority for matters of personnel management.

25.    The City Policy Manual provides that policies adopted by other Department Heads are subject to the City Manager's approval, without reservation of any role for the City Council.

26.    The City Policy Manual provides that sexual harassment complaints are to be promptly and thoroughly investigated by the City Manager, without reservation of any role for the City Council.

6

27.     The Policy Manual requires the City Manager to review and approve of any disciplinary action, without reservation for any role for the City Council.

28.     According to the City Policy Manual, the highest level of review for discipline is to the City Manager, whose decision is final, without reservation of any role for the City Council.

29.     The City Policy Manual provides that any complaint of harassment is to be dealt with through the Policy Manual's grievance procedures.

30.     The Policy Manual's Grievance Process requires that an aggrieved employee must first attempt to resolve a grievance in an informal conference with their immediate supervisor. Ms. Wells regularly and persistently informally conferred with her immediate supervisors about sexually offensive conduct, without any resulting resolution.

31.     Elsewhere, the Policy Manual also provides an aggrieved employ with options to initiate a grievance by notifying the next higher manager above the immediate supervisor, the City Secretary and the City Manager, and that harassment complaint will be investigated by the City Manager. Ms. Wells regularly and persistently notified her next higher manager above her immediate supervisor, the City Secretary and the City Manager about sexually offensive conduct, without any resulting resolution.

32.     All of Defendants' actions omissions were performed consistent with, and as a result of the driving force of the City's policies in its Policy Manual.

**C.      Sexual and retaliatory discrimination and City inaction:**

33.     The following events include some examples of sexual harassment and retaliation Plaintiff Wells was subjected to while working for Defendant City of Corrigan.

34.     Within the first few weeks of Plaintiff Wells' employment by Defendant City of Corrigan, Defendants Municipal Judge Yankie, City Manager Darrian Hudman, Police Chief Darrell Gibson

7

and CPD Officer Bert Simms, began subjecting Ms. Wells to inappropriate, offensive, hostile sexual and/or retaliatory conduct which persisted, and increased, throughout Ms. Wells' tenure.

35.     Judge Yankie was at all time pertinent Ms. Wells' immediate supervisor or next-level of management, and, therefore, a city official the Policy Manual designated for Ms. Wells to notify and or informally confer with in order to initiate action in response to sexual harassment complaints.

36.     Because Judge Yankie was also often the sexual harasser—or at least complicit in the sexual harassment Ms. Wells complained of—his involvement undermined the City's policies and practices regarding sexual harassment.

37.     City Manager Hudman was at all times pertinent one of the city officials that the City Policy Manual designated for Ms. Wells to notify and/or informally confer with to initiate action in response to her sexual harassment complaints.  The Policy Manual also designated Mr. Hudman, as City Manager, to conduct any investigations into sexual harassment complaints and as the final decision maker regarding any grievances, the City's process for handling sexual harassment complaints.  Because City Manager Hudman was often a sexual harasser—or at least complicit in the harassment Ms. Wells complained of—his involvement also undermined the City's policies and practices regarding sexual harassment.

38.     That sexually offensive conduct continued and often increased after and because Ms. Wells reported it to the City of Corrigan.  This response foreseeably discouraged Ms. Wells and other reasonable employees from opposing illegal discrimination, constituting retaliation.

39.     Initially Defendant Municipal Judge Yankie was Plaintiff Wells' supervisors' supervisor. He persistently and frequently insisted on inappropriately talking to Ms. Wells about his sex life, including saying that he had not had sex with his wife in years but still used a "blue pill" to have

sex.  On these occasions Ms. Wells notified Judge Yankie that she was offended and unsuccessfully tried to discourage him from talking about sex.  In response, Judge Yankie persisted, and often increased, his offensive sexual comments.  Ms. Wells also often notified and informally conferred with her immediate supervisor, Deputy Clerk Tammy Ezernack, about the Judge's inappropriate sexual and other hostile behavior.  Because Judge Yankie was Ms. Ezernack's supervisor, she understandably felt powerless to do anything it.

40.     In Ms. Wells presence, Defendants Judge Yankie and City Manager Hudman, repeatedly discussed their approval of a former female employee's short dresses, high heels, and "big titties," saying they missed her and wanted to hire her back.  Throughout Ms. Wells' tenure, and over her objections, they encouraged her to dress like the former employee did.  Ms. Wells expressed her offense and disapproval to the Judge and City Manager Hudman and notified and informally conferred with both of them and her immediate supervisor about it.  Nonetheless, similar comments persisted.

41.     Throughout Ms. Wells' tenure, Judge Yankie, City Manager Hudman, and other city officials, including Defendant Corrigan Police Chief Gibson, routinely discussed their own and other city officials' sexual activities both on and off the job.  Ms. Wells disapproved of, opposed, and displayed her offense during these discussions by not responding, turning away, leaving, and/or notifying and informally conferring about it with her first level supervisor, the Judge and/or City Manager.  Nonetheless, these activities continued and even increased.

42.     Judge Yankie regularly said to Ms. Wells that he was going to come to her office to "look at" her.  Ms. Wells made it clear that this was creepy, unprofessional, and sexually offensive to her, but Judge Yankie persisted.  Judge Yankie did not say this sort of thing to men.  Ms. Wells notified and/or conferred with her immediate supervisor, next higher level of management, City

Manager and/or City secretary, about this sexually offensive conduct.  Judge Yankie did not decrease, but increased, this sort of comment during Ms. Wells' tenure.

43.     Defendant Bert Simms, then a Corporal and Detective in the Corrigan Police Department, said in Ms. Wells' and her immediate supervisor's presence that he woke up sexually aroused with only a cat around.  Ms. Wells called him a pervert, expressing her offense.  Ms. Wells' immediate supervisor reported the matter informally to the City Secretary, who did not feel she could do anything about it.

44.     During, or near, the summer of 2017, Judge Yankie began telling Ms. Wells that she would have to accompany him to a seminar in Austin, and that he expected her to go to bars with him while there.  She notified and informally conferred with City Manager Hudman, telling him that the thought of accompanying Judge Yankie on this trip was offensive, made her feel uncomfortable, and that she did not want to go out-of-town with the Judge.  Defendant Hudman made her go, telling her to just to say she did not want to go to bars with him.  While in Austin, Judge Yankie required Ms. Wells to walk down Sixth Street (known for its many popular bars and nightlife) with him while he approached and talked to young women.  The Judge also insisted on ordering Ms. Wells wine at a restaurant, over her objection.  Several times Judge Yankie said to Ms. Wells, "will they think we're together?" and "will they think I'm your sugar daddy?"  It was humiliating.  During her tenure with the City, Ms. Wells was required to similarly attend two more such seminars with Judge Yankie.  During the additional trips Judge Yankie treated Ms. Wells much like he did during the one in 2017.  Ms. Wells also notified and informally conferred with City Manager Hudman about the additional trips, without result.

45.     By the end of summer 2017, a few of the Corrigan police officers had approached Ms. Wells and expressed interest in dating her.  Her standard response became something like, "I'm

not interested.  I'm a happily married woman." Sometimes this rejection worked, sometimes it did not.

46.     During 2017, Defendant former CPD Officer Simms and another CPD Officer/bailiff, began lobbying Ms. Wells to date Simms.  Several times Officer Simms came to Ms. Wells' office to tell her he was interested and attracted to her and ask for her phone number.  Each time Ms. Well told Officer Simms that she was happily married and not interested in him.

47.     After a couple of weeks of this, Officer Simms unexpectedly appeared in Ms. Wells' office, offering her a jacket, explaining he thought she looked cold in pictures the other officer had been surreptitiously taking of her and providing to Simms.  Ms. Wells notified and informally conferred with Judge Yankie about Officer Simms' and the other officer's lobbying efforts, including the photos and that she was offended.  There was no indication the Judge did anything about it

48.     The other officer then began to repeatedly also tell Ms. Wells that Officer Simms, who he referred to as "Poppy," was interested in and attracted to her.  Each time Ms. Wells similarly responded, saying she was happily married, not interested, eventually telling the other officer to "shut up."  Ms. Wells notified and informally conferred with Judge Yankie about being offended by Officer Simms's and the other officer's actions (described briefly in the prior paragraphs), describing it as sexual harassment. Judge Yankie's response was a joke:  he got a name plaque for Ms. Wells' door indicating that she was "Mrs." Wells.  This action by Judge Yankie telegraphed that he did not take Ms. Wells' report of harassment seriously and that he was unlikely to properly respond to reports of sexual harassment.

49.     Within a few days, Judge Yankie told Ms. Wells that Officer Simms was going to talk to her about a case.  This was an unusual comment suggesting that Officer Simms had the Judges' approval to meet with Ms. Wells despite her reports of Officer Simms's offensive conduct.  Then

Officer Simms came into Ms. Wells' office, shutting the door behind him, and bluntly propositioned Ms. Wells. Trapped in the office; Ms. Wells crossed her arms and legs and glared at Officer Simms to communicate her offense at his proposition.  He eventually said she was making him feel like a "dumbass." Ms. Wells agreed.  Simms left.  The circumstances suggested that Judge Yankie was complicit in Officer Simms's harassment of Ms. Wells.

50.     Ms. Wells also notified and informally conferred with the City Secretary about these events involving Officer Simms, referring to him as a "pervert."  While the City Secretary seemed to take the report seriously, she did not seem surprised or think she could do anything about it.

51.     Ms. Wells did notify and informally confer with Judge Yankie about Officer Simms's proposition.  The Judge later said that Simms admitted and apologized for propositioning Plaintiff Wells, but the Judge said was not going to say anything about it to anybody else, "for now."  This telegraphed to Ms. Wells that the Judge knew her report of sexual harassment was true, but he did not consider it serious.  Later, City Manager Hudman said the Judge also told him that Officer Simms had admitted to propositioning Ms. Wells.

52.     A few weeks later, other CPD officers told Ms. Wells that Officer Simms was telling the other officers there was no policy against officers having sex with whoever they want, and he wanted to have sex with her.  When Ms. Wells reported, notified, and informally conferred with Judge Yankie about Simms' comments, he at first said he would talk to Defendant Police Chief Gibson, but later said he did not and "that's just the way things are around here."

53.     Much later, Officer Simms' and other officers' sexual conduct was being discussed, Defendant Police Chief Gibson said something like, "if CPD officers want to have sex, they will. That's what men and women do, and [he, Chief Gibson] can't stop it."  This suggested that the Police Chief had no intention of doing anything to stop Officer Simms's harassment of Ms.Wells

54.     Probably in the fall of 2017, right after one of the times Ms. Wells had notified and informally conferred with Judge Yankie about more incidents of his sexually offensive conduct, Judge Yankie started telling Ms. Wells that, because of his training and experience, he knew what he could and could not get away with regarding sexual harassment, so it would not do any good for her, or anybody, to complain about him.  Judge Yankie started saying that, or something similar, regularly.  Judge Yankie saying that foreseeably dissuaded Ms. Wells from reporting sexual harassment to or about Judge Yankie.

55.     Also, probably in the fall of 2017, Ms. Wells was present and heard Defendant City Manager Hudman tell Ms. Ezernack (then Wells' immediate supervisor), "incest is best" and to get her daughter for the three of them (Hudman, Ms. Ezernack and her daughter) to have sex. Both Ms. Wells and Ms. Ezernack were visibly offended which, under the circumstances, had to be obvious to the City Manager.  Because City Manager Hudman appeared to be the highest-ranking city official in Corrigan, they did not know what else they could do.

56.     Also, probably in the fall of 2017, Judge Yankie started saying he was going to bend a female bailiff over his knee and paddle her.  This became one of his common comments.  He certainly did not say it to any of the men.  The bailiff he was referring to, Ms. Wells, and others who heard these comments were visibly offended.  The Judge knew it was offensive, but seemed amused that he could get away with it.

57.     During late 2018, Judge Yankie began persistently telling Ms. Wells that a woman pictured in a hog-hunting magazine reminded him of Wells, that she looked just like Wells:  "easy on the eyes, long-legged, and had long blonde hair." Eventually Judge Yankie gave her a copy of the magazine, which Ms. Wells made clear was not welcome.  The Judge ignored her discomfort and insisted that she look at the magazine *while* he watched her looking at it.  The picture was of the

woman standing on a pile of dead hogs, brandishing a gun.  The Judge said he could see Ms. Wells standing on a pile of hogs just like that. This was very creepy and offensive, and gave Ms. Wells the impression that the Judge had some sort of psychological fixation on her.  Later, Ms. Wells reported this to, notified and informally conferred with Defendant City Manager Hudman about this offensive incident, describing it as another complaint about sexual harassment.  City Manager Hudman just said he did not want to look at the magazine.

58.     Also in late 2018, Ms. Wells started to informally confer with the City Manager, notifying him of some of the other instances of discrimination she had reported to Judge Yankie that he (the Judge) apparently had not reported to the City Manager.

59.     In December 2018, Ms. Wells learned City Manager Hudman was accusing her of "stealing time."  Judge Yankie said he did not know anything about it.  City Manager Hudman said he was "investigating" Ms. Wells for, not "accusing" her of, not being at work when she was being paid to be at work.   When pressed, Hudman could not plausibly explain what precipitated his investigation.  At first, Hudman claimed somebody (he would/could not name) said Ms. Wells' car had not been where and when she usually parked it.  Judge Yankie pointed out several likely legitimate reasons her car might not be there when she was working, none suggesting she was stealing time.  City Manager Hudman did apologize for the investigation, but was unable to offer a legitimate reason for suspecting Ms. Wells stole time.  In the absence of a plausible explanation, Ms. Wells was reasonably concerned that City Manager Hudman wanted a reason to fire her and/or wanted her to worry that he could easily make up a pretext to fire her, to further discourage her from reporting discrimination.  A couple of months later, the City Manager tried again by saying questioning her for stealing time was a bad way for him to see if he could trust her, and he knew it meant they could never get along after that.

60.     In late 2018 or early 2019, City Manager Hudman told Ms. Wells that she had a heck of a case and should have sued the City for sexual harassment and that nobody liked her anyway.  When hearing of this, Judge Yankie told Ms. Wells that she should sue him too if she was going to sue the City, but she would not get anything, and nobody would ever hire her because of it.  This warning of Ms. Wells being blacklisted certainly fits the definition of a retaliatory action.

61.     In early 2019, Judge Yankie insisted on telling Ms. Wells a joke about breasts and penises, over her protests and discouragement.  Ms. Wells made her offense apparent, but the Judge insisted on finishing his joke.

62.     In February 2019, during a phone call, Judge Yankie told Ms. Wells that she had a "full right" to sue Officer Simms for asking her to have sex.

63.     In late February 2019, the female bailiff who the Judge had taken to threatening to bend over his knee and paddle, finally quit.  Her given reason included that the City of Corrigan was becoming a hostile work environment, "if you stand up for yourself and what you believe in you will be reprimanded," and it was taking a toll on her and her family at home.  The Judge kept saying that he did nothing wrong.

64.     The City Manager suggested that they re-hire Bert Simms to take the former female bailiff's place.  Both Ms. Wells and Judge Yankie considered the mention of Simms returning to be hostile and harassing to Ms. Wells.

65.     At about the same time Judge Yankie, City Manager Hudman and other City employees were often talking about police officers' sexual practices.  Judge Yankie and City Manager Hudman were particularly graphic, including describing photographs of the sexual acts they claimed to have.  These conversations reflected their amusement, not disapproval.  They said one City officer had been charged and fired for sexual assault, but then rehired.  They asked Ms. Wells

if he could be using traffic tickets to get women's phone numbers.  Ms. Wells notified and informally conferred with them, saying that the events they were talking about made her feel less safe from sexual harassment.  Judge Yankie agreed with her and said it was giving the City a bad name.  Clearly, the hostile work environment was getting worse, not better.

66.     By March 2019, Judge Yankie and City Manager Hudman had begun to speculate whether Ms. Wells was going to quit and/or sue the city for sexual harassment—at times in Ms. Wells' presence.  They occasionally asked her if she was quitting or suing the City.

67.     By early March 2019, City Manager Hudman and Ms. Wells began to more frequently discuss the sexual harassment at the City.  Mr. Hudman started to express disgust at the way the Judge treated Ms. Wells.  Under the circumstances, his disgust did not appear genuine.

68.     In early March, 2019, Ms. Wells notified and informally conferred and discussed with Judge Yankie various instances in which City Manager Hudman and former Officer Simms had sexually harassed her and offended her with sexual inappropriate comments. The Judge agreed with her disapproval but did not offer to do anything about it.

69.     In early March 2019, Judge Yankie told Ms. Wells that she cannot trust the "higher-ups" in the City and that they will pin something on you have not done, which happened to an officer who wanted to reform the police department.  The Judge said that is why Ms. Wells should get her personnel file, to prevent a set up.  Ms. Wells asked the Judge for her personnel file, and the Judge said to get it from City Hall.

70.     When Ms. Wells asked for a copy of her file at City Hall, City Manager Hudman kept asking her if she was going to quit or sue.  The City Manager then said she had three separate personnel files for different types of documents.  When he returned from getting them, he said

something like "you must be a really good employee" because the only document in any of them was a copy of her job application.

71.     When Ms. Wells requested her personnel file from City Manager Hudman he also again joked about rehiring former Officer Simms to be the Municipal Court Bailiff.  When Ms. Wells was offended and protested that his jokes about Simms were not funny, the City Manager argued that he thought they were funny.  Hudman also confirmed that he had known former Officer Simms had admitted to propositioning Ms. Wells.  These comments further undermined any hope that the City would address any harassment Ms. Wells reported.

72.     In early March 2019, in Ms. Wells' presence, City Manager Hudman told a story about a former black employee who had asked for his personnel file and was fired.  Ms. Wells felt this was intended as a threat since she had asked for her personnel file.

73.     Shortly after refusing to give Ms. Wells access to her personnel file, City Manager Hudman again asked Ms. Wells if she was quitting and said he was offended she had asked for her personnel file.  Ms. Wells responded that she was offended that he had falsely accused and investigated her for stealing time.

74.     At about that time, Judge Yankie told Ms. Wells that he told City Manager Hudman to stop telling Ms. Wells that he (the City Manager) wanted to rehire former Officer Simms because doing so was a form of harassment.  Judge Yankie also said he reminded the City Manager the he, the City Manager, told Ms. Wells she should sue the City.

75.     In early March, 2019, Municipal Judge Yankie told Ms. Wells that no one at the City could be trusted to address its problems with sexual harassment.

76.     Also in early March, 2019, City Manager Hudman told Judge Yankie that the City Attorney said "nobody had a leg to stand on" to sue the City for sexual harassment and they could forget about anybody filing a lawsuit.

77.     While eating lunch in early March, City Manager Hudman start persistently teased a female Municipal Court Deputy Clerk that he said looked like a girl he knew in Onalaska, implying that he might be interested in "seeing" the Deputy Clerk also.  The Deputy Clerk was visibly offended, but the City Manager and Judge Yankie said it was funny.  The Judge said openly joked about them (City Manager Hudman and the Deputy Clerk) being found together in Onalaska, offending her further.  Shortly afterward, the Deputy Clerk quit:  citing sexual harassment as the reason. When Judge Yankie learned she quit, he asked if she was going to sue and denied there was any sexual harassment.  He then texted an apology to her for telling an offensive joke.  The Deputy Clerk described the Corrigan Municipal Court as "a very Hostile and sexual harassment working environment."

78.     By mid-March 2019, City Manager Hudman told Ms. Wells he was hurrying to hire another employee for the municipal court because he did not want Ms. Wells to be alone with Judge Yankie.  The City Manager said he was concerned the Judge could make stuff up about Ms. Wells. The City Manager also encouraged Ms. Wells to take time off and consider leaving her position. These comments suggested that the only way Ms. Wells could escape the harassment and retaliation was to terminate her own employment.

79.     By mid-March 2019, Judge Yankie told Ms. Wells that he thought people at City Hall wanted to fire him.

80.     In mid-March 2019, Ms. Wells reported to City Manager Hudman more harassment and inappropriate jokes by Judge Yankie.  Apparently, the City Manager then told Judge Yankie about

her report because the next day the Judge apologized, but did not dispute her report.  The Judge also asked if Ms. Wells was going to sue and accused her of using inappropriate language.

81.     In mid-March 2019, during a meeting, Ms. Wells complained to Judge Yankie and City Manager Hudman that they (she and co-workers) do not know who they can report complaints to, because the Judge said not to report things to City Manager Hudman or anybody at the City because they cannot be trusted.  They just say she can still talk to them, but the timing of her recent complaints and request for an evaluation was hurtful to them.  Mr. Hudman blames unidentified others for "starting the ball rolling," and admits his "questioning" Ms. Wells about theft of time was bad, and he knew they could never be friends after he did that.

82.     In late-March 2019, City Manager Hudman told Ms. Wells not to trust Judge Yankie, that he had crossed the line.

83.     By late March 2019, several Corrigan police officers said they were told they could not to talk to Municipal Court employees and that the City Manager was insisting on signed confidentiality agreements.

84.     On or about March 27, 2019, City Manager Hudman said Judge Yankie was going to be suspended for a week without pay, and would be fired if he did not quit.

86.     On or about, March 28, 2019, City Manager Hudman told Ms. Wells that he had suspended Judge Yankie for 15 days and was writing him up for sexual harassment and hostile environment. The change in the action without explanation undermined Hudman's already questionable credibility.

87.     On or about March 29, 2019, City Manager Hudman changed his proposed action again, saying Judge Yankie's suspension would not start until April 8, 2019.  This additional change/delay in the City Manager's claimed plan of action further undermined his credibility.

88.     On, or about, April 1, 2019, City Manager Hudman told Ms. Wells that _Judge Yankie said he had been conditioning her to have sex with him_, but still neither the City Manager nor the City took any immediate action to correct or prevent the sexual harassment and/or retaliation from continuing or to otherwise protect Ms. Wells, or other employees, from Judge Yankie's discriminatory and hostile treatment.

89.     Due to the events described above, Ms. Wells was so upset that she could barely function.

90.     By April 4, 2019, Ms. Wells sought counselling because of the stress caused by the events described above.  She had been losing weight, sleep, hair, and the ability to relax or focus her attention.  Ms. Wells' counselor advised her to resign immediately, and did so the next day.

91.     The actions described above were sufficiently severe and egregious to constituted discrete actionable acts of discrimination and retaliation, and collectively were sufficiently similar and related to constitute an actionable continuing hostile work environment based on sexual harassment and/or retaliation culminating in her constructive discharge.

## LEGAL CLAIMS

92.     The Defendants' treatment of Plaintiff Wells, described above, violated her rights to equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution, which is made actionable by § 1983.

93.     The Defendants' treatment of Plaintiff Wells, described above, violated her rights to free speech guaranteed by the First Amendment to the United States Constitution, which is made actionable by § 1983.

94.     The Defendant City of Corrigan's treatment of Plaintiff Wells, described above, violated _Texas Labor Code_ provisions prohibiting employment discrimination and retaliation, which is made actionable by that statute.

20

## **DAMAGES AND RELIEF REQUESTED**

95.    Plaintiff Wells seeks appropriate equitable relief requiring Defendants to make her whole as if the discrimination and retaliation complained of herein had not occurred, including reinstatement if reasonable (or an award of front pay if reinstatement is not reasonable), compensation for all past and future benefits and emoluments of her position that she would have received if Defendants' acts of discrimination and retaliation had not occurred, and further equitable relief reasonably prohibiting any future acts of discrimination or retaliation against Plaintiff.

96.    Plaintiff Wells seeks to be compensated fairly for the emotional trauma and stress caused by Defendants' discrimination and/or retaliation, including but not limited to compensation for such distress she experienced in the past and that she is reasonably expected to experience in the future and the costs of related reasonable medical care.

97.    Plaintiff Wells seeks awards of punitive damages from the individual Defendants for their treatment of her that was willful, malicious and/or in reckless indifference to her rights, to punish for their misconduct and deter them, and others, from committing similar misconduct in the future.

98.    Plaintiff Wells seeks an award of her litigation costs reasonably incurred in this case, including attorney's fees and court costs, for which Defendants are jointly and severally liable.

99.    Plaintiff Wells seeks award of the maximum amount(s) of pre- and post- judgment interest permitted by law.

100.    Plaintiff Wells seeks any other relief permitted by law.

## **JURY REQUESTED**

101.    Plaintiff requests trial by jury for all claims triable by jury.

## **PRAYER**

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants for the following:

a.    Actual damages due to her under the law, including but not limited to back pay, front pay, and compensation for past, present and future lost benefits;

b.    Compensatory damages;

c.    Damages for mental anguish;

d.    Punitive damages—from the Individuals Defendants;

e.    Reasonable attorney's fees;

f.    Costs of suit;

g.    Prejudgment and postjudgment interest; and

h.    Such other and further relief, at law or in equity, to which Plaintiff may show herself justly and lawfully entitled.

Respectfully submitted,

**FRANKLIN LAW FIRM, PLLC**

**Tanner G.M. Franklin**
Texas Bar No. 24082506
tfranklin@tfranklinlawfirm.com
2528 Highway 103
Etoile, Texas 75944
(936) 854-3213 — Telephone
(888) 430-2559 — Fax

**ATTORNEY FOR PLAINTIFF**